UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PATRICIA A. BRYSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-0300-CVE-FHM |
| | ) | |
| RENDA BROADCASTING, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

<u>AMENDED OPINION AND ORDER</u>

Now before the Court is Defendant's Motion for Summary Judgment and Brief in Support (Dkt. # 57). Plaintiff alleges gender and age discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, <u>et seq</u>. (Title VII) and the Age Discrimination in Employment Act (ADEA), and under Oklahoma common law. Defendant moves for summary judgment on the grounds that Bryson's termination was not the result of illegal gender or age discrimination.

**I.**

The parties agree on very few facts, but many of the disputed "facts" are actually objections to characterizations and arguments. Where the objection to a fact is on the basis of relevance only, the Court will deem that fact undisputed and will make a determination of the materiality or relevance; however, some of the arguably irrelevant facts merely provide context. Construing the record in the light most favorable to plaintiff, the following is a general description of the background of this action.

**A.    Bryson's Employment History**

Defendant, Renda Broadcasting Corporation (RBC), owns and operates radio stations, including KBEZ and KHTT in Tulsa, Oklahoma.  Serena Depo., Dkt. # 57-3, at 7.  Tony Renda is the president of RBC, and other corporate officers include Vice President of Sales Judy Reich, Vice President/Controller Maryann Kelly, and Vice President of Operations Alan Serena.  Id. at 2.  According to plaintiff, Renda controlled the other RBC corporate officers.  Bryson Depo., Dkt. # 57-2, at 35.

On or about December 17, 1990, plaintiff Patricia Bryson was hired as the General Manager (GM) of one of the two RBC radio stations in the Tulsa market.  Dkt. # 57-3, at 11.  She was hired by Rob Adair, GM of RBC Oklahoma City.  Bryson Aff., Dkt. # 71-2, at 1.  In the mid-1990s, Bryson became the GM of both Tulsa stations.  Bryson Depo., Dkt. # 57-2, at 40.  Bryson's supervisor, Adair, promoted her to Vice President in October 1994.  Bryson Aff., Dkt. # 71-2, at 1.  The new title did not change her compensation or responsibilities.  Id.  At the time Bryson was terminated in 2005, the Tulsa market was out-performing most of the RBC markets, and may have been the top-performing RBC market.  Bryson Aff., Dkt. # 71-2, at 2.  RBC never investigated the Tulsa market's performance in relation to other markets when it terminated Bryson's employment.  Renda Depo., Dkt. # 71-2, at 14-15.

The RBC corporate office established the procedures, revenue and expense budgets, and reporting forms for Tulsa and exerted "a lot of control" over the Tulsa market.  Bryson Depo., Dkt. # 57-2, at 41.  For example, RBC corporate had to approve every job offer Bryson made.  Id.  Bryson testified that she had good working relationships with Serena, Reich, and Kelly.  Bryson Aff., Dkt. # 71-2, at 2.  Defendant objects to plaintiff's contention that she had a "good" relationship

2

with corporate because she testified that she believed she would be fired. Dkt. # 82, at 8. Until mid-2003, Bryson had only minimal contact with Renda. Dkt. # 71, at 16. Instead, she reported to Adair and Adair's replacement, Vance Harrison. Bryson Depo., Dkt. # 57-2, at 7. All of the other RBC GMs reported directly to the RBC corporate office. Renda Depo., Dkt. # 71-3, at 5. Neither Adair nor Harrison complained about Bryson's performance as a GM. Id. at 4-5. Bryson never received a formal, written performance warning from RBC corporate or from either of her supervisors. Bryson Aff., Dkt. # 71-2, at 2. Nonetheless, Serena, Reich, and Kelly all signed affidavits stating that Bryson was more argumentative and difficult to work with than other RBC GMs. Dkt. # 57-3, at 28-31.

Bryson alleges that, once she began reporting to Renda in 2003, he showed "obvious disdain" for working with "older, female GMs." Dkt. # 71, at 16. Defendant disputes plaintiff's assertion that Renda showed "obvious disdain." Dkt. # 82, at 9. Bryson testified that she believed that she had no credibility with Renda, while the male GMs did. Bryson Depo., Dkt. # 71-4, at 9. Plaintiff also states that her opinion was shared by other female GMs at RBC. Id. B.J. Nielsen, the former GM of the RBC Daytona Beach, Florida market, testified that she believed that Renda did not have respect for women in the workplace. Nielsen Depo., Dkt. # 71-9, at 3. However, defendant argues that Diana Albright,[1] the former GM of the RBC Punxsutawney, Pennsylvania market, attributed any lack of credibility with Renda to an incident with her former employer, and not to her gender. Albright Depo., Dkt. # 57-3, at 42-44.

Bryson sometimes expressed differences of opinion to RBC corporate in the areas of budgeting and forecasting. Bryson Depo., Dkt. # 57-2, at 44. At times, Bryson and Renda

---

[1]     Plaintiff refers to Albright by her married name, "Diana Stapleford."

experienced "difficulties" in communicating with each other.[2]  Id. at 4-6.   These difficulties were exacerbated by miscommunications caused by communicating through Reich and Serena as intermediaries.  Id.  One area where Bryson and Renda had differing opinions was with respect to whether Tulsa should have a sales staff for each station, or whether the two stations should share a single sales staff.  Id. at 45-48.  Plaintiff asserts that, despite differences of opinion, she always complied with orders given by her supervisors.  Bryson Aff., Dkt. # 71-2, at 2.  Bryson testified that, in March 2004, she had a two-hour phone conversation with Renda about their differences of opinion on how the Tulsa market should be run.[3]  Bryson Depo., Dkt. # 57-2, at 54-56.  Bryson also testified that during their conversation she and Renda discussed whether they would "shake hands," which she interpreted to mean that Renda was considering firing her.  Id.  In or about April 2004, Renda resolved the sales staff issue by ordering that the current sales staff would sell for both Tulsa stations, but any new hires would be assigned exclusively to one station.  Id. at 48-49.

In about 2000, Bryson started telling other employees that she expected to be fired or replaced.  Id. at 51.  She said she believed she would be fired "[b]ecause [Renda] was uncomfortable dealing with [her]."  Id. at 52.  According to plaintiff, Renda, Serena, and Reich were "always interviewing potential candidates for GM positions throughout the country."  Reich Depo., Dkt. # 71-6, at 6.  According to Serena, however, there were interviews specifically for Bryson's job in the

---

[2]     Plaintiff argues that she did not testify that she had "difficulties" communicating with Renda. Dkt. # 71, at 8.   However, the transcript of her deposition reflects that she was asked questions about "difficulties" with Renda, which she answered in the affirmative.  Bryson Depo., Dkt. # 57-2, at 4-6.

[3]     Plaintiff argues that her deposition does not support this factual contention. Dkt. # 71, at 10. The Court has reviewed Bryson's deposition transcript and finds that defendant has accurately represented her testimony as to this point.

"2002, 2003 timeframe."  Serena Depo., Dkt. # 57-3, at 6.  Candidates included Chuck Browning,

Rick Cohn, and "at least one other male."  <u>Id.</u>  Bryson was not replaced by any of these interviewees

because Renda did not believe that any could perform her job.  <u>Id.</u>  Bryson testified that, starting in

the first quarter of 2004, she started to have conversations with Serena about her being fired or

replaced.  Bryson Depo., Dkt. # 71-4, at 27-28.

**B.     Bryson's Replacement and Discharge**

In or about July 2005, Renda and Reich interviewed Jon Phillips, a former sales manager for

an RBC competitor, for the position of General Sales Manager (GSM) of the Tulsa market.  Bryson

Depo., Dkt. # 57-2, at 73-74.  Renda testified that Reich spoke to people in the Dallas radio market

who suggested that Phillips was a good candidate for a position at RBC.  Renda Depo., Dkt. # 71-3,

at 17-18.  After the interview, Reich suggested that Bryson interview Phillips for a sales position.

Bryson Aff., Dkt. # 71-2, at 3.  On or about July 11-12, 2005, Renda asked Phillips to fly to RBC

corporate headquarters to meet with him in person.  Phillips Depo., Dkt. # 71-16, at 6.  During that

meeting, Renda told Phillips that he planned to hire a second GM for Tulsa and return to a two-

manager system, which he believed had worked in the past.  <u>Id.</u> at 7.  Phillips testified that sometime

in the day or days between his trip to Pittsburgh and his interview with Bryson, he was offered the

position as GM of KHTT Tulsa and declined it.  <u>Id.</u> at 13.

Bryson interviewed Phillips by phone on or about July 12 or 13, 2005.  Bryson Depo., Dkt.

# 57-2, at 73.  Bryson learned that Phillips had been a general sales manager for the Tulsa, Dallas,

and Kansas City markets, and had used split sales staffs in the past.  <u>Id.</u> at 75.  Bryson "liked what

Phillips had to say" and thought he would be a good sales manager.  <u>Id.</u> at 76.  Phillips testified that

Renda told him not to mention to Bryson that he had been to Pittsburgh and had subsequently been

offered the position of GM of one of the Tulsa stations, nor did he mention that he was not interested in the GSM position. Phillips Depo., Dkt. # 71-16, at 14. On or about July 18, 2005, Bryson called Serena and informed him that Phillips' salary demands for the general sales manager position exceeded what she was authorized to offer. Bryson Depo., Dkt. # 57-2, at 81. According to Bryson, Serena told her to interview other candidates for the position. Id.

During the week of July 20, 2005, Renda offered Phillips the position of GM of both Tulsa stations.[4] Phillips Depo., Dkt. # 71-16, at 16. On or about August 3, 2005, Bryson was asked to travel to Oklahoma City to meet with Renda and Reich. Bryson Depo., Dkt. # 57-2, at 81. On her drive from Tulsa to Oklahoma City, Bryson received a call from a member of her staff, Van Webb, who told her that he heard RBC hired Phillips as the GM for Tulsa. Id. at 83. When Bryson arrived, Renda told her that RBC had decided to make a change in Tulsa. Bryson Depo., Dkt. # 71-4, at 38. Bryson informed Renda and Reich that she already knew about Phillips. Id. Renda started "ranting" that Bryson should have hired Phillips as a GSM. Id. at 39. According to plaintiff, Renda's rant was "completely disingenuous because Renda knew that he had already offered Phillips a position as the GM of [one of the Tulsa stations]." Dkt. # 71, at 11. Bryson asked Renda if he thought she was a bad manager, and he answered "Yes, you're a bad general manager." Bryson Depo., Dkt. # 57-2, at 86. Bryson asked Renda for a more substantive reason for her termination, but Renda did not give her one. Id.

Bryson then argued that her operating profit percentage was number one at RBC as of June 2005. Id. After a discussion of Bryson's accomplishments as GM and why, despite those

---

[4]     Plaintiff contends that Renda and Serena both decided to replace Bryson. Bryson Aff., Dkt. # 57-2, at 94. Defendant argues that Renda made the decision. Renda Aff., Dkt. # 57-3, at 27.

accomplishments, Bryson was being replaced, she was given an offer to be the sales manager of one of the two Tulsa stations, reporting to Phillips.  Id. at 87-88.  Bryson did not immediately respond to the offer, but instead expressed her belief about the way she was treated while working at RBC. Id. at 90.  Bryson alleged that Vance Harrison, GM of the RBC Oklahoma City, Oklahoma market, received deferred compensation without signing a non-compete agreement.  Id. at 91.  Bryson then told Renda that she believed that he was always uncomfortable around her and that the use of an intermediary for their communication had not worked.  Id.  Renda responded by telling Bryson that Harrison received the deferred compensation because he verbally agreed to a non-compete agreement, and Renda agreed that the use of intermediaries might have caused their communication problems.  Id. at 92.  Bryson asked Renda whether she would receive a severance package, and he told her he would need to think about that.  Id. at 93.

On her drive home from Oklahoma City, Bryson received a call from Reich urging her to take the position she was offered.  Id. at 94.  The next day Bryson called Renda and again asked about the possibility of a severance package.  Id. at 95.  Renda offered her four months' compensation and

benefits.  Id.  Later that evening, Bryson informed Renda that she would not take the alternate position and accepted the severance package.  Id. at 100.

## C.     Reasons Given for Bryson's Termination

Sometime after Bryson left RBC, Reich told Bryson that she was not fired because of her numbers, but because she did not hire Phillips.  Id. at 102.  Bryson testified that Reich told her that she did not agree that Bryson should have been fired.  Id. at 94.  Reich later signed an affidavit stating that she discussed Bryson's termination with Renda and agreed with the decision.  Reich

Aff., Dkt. # 57-3, at 28. Nonetheless, Reich stated that she was "absolutely" willing to write a letter of recommendation for Bryson. Dkt. # 71-2, at 7.

RBC contends that Bryson was replaced because of ongoing concerns about her management skills, her financial performance, her understanding of financial matters, and her difficulties in working with the corporate officers– male and female. Serena Aff., Dkt. # 57-3, at 29; Kelly Aff., Dkt. # 57-3, at 31. Plaintiff disputes these four reasons, and asserts that she was told that she was being terminated only because of the difficulty Renda and other corporate officers had in working with her. Dkt. # 71, at 13.

RBC believed that Phillips' large market experience would be beneficial to the Tulsa market. Serena Depo., Dkt. # 57-3, at 10. Bryson believed that Renda hired Phillips for a variety of "philosophical reasons," including their mutual love of football and their agreement about the use of split sales staffs. Bryson Depo., Dkt. # 57-2, at 60-61. She also contends that Phillips had minimal experience in the Tulsa radio market and had no experience as a GM. Dkt. # 71, at 20. Renda testified that it was important for a GM to have knowledge of the agencies, clients, and community leaders in the local market. Renda Depo., Dkt. # 71-3, at 3.

Bryson filed a claim with the Equal Employment Opportunity Commission (EEOC) alleging age and gender discrimination. Dkt. # 71-18. On May 22, 2006, RBC submitted a position statement to the EEOC. Dkt. # 71-9. In its position statement, RBC stated that Bryson's "sales figures were consistently criticized for being consistently below the expected sales figures arrived at between the corporate office and Ms. Bryson during budget planning." Id. Plaintiff alleges that RBC "stated only one reason for Bryson's termination – poor performance with regard to her 2005 sales figures." Dkt. # 71, at 20-21. RBC disputes plaintiff's characterization of RBC's stated reason

for terminating Bryson.  Dkt. # 82, at 10.  The EEOC sent a Request for Information to RBC asking for details about other employees who had the same or similar performance issues as Bryson.  Dkt. # 71-20.  Plaintiff claims that RBC's response to the EEOC's request stated no other reasons for Bryson's dismissal, and falsely claimed that Williston was fired when he in fact resigned.  Dkt. # 71, at 20-21.   RBC disputes plaintiff's contention and notes that its response was tailored to the EEOC's question and was not a general position statement.  Dkt. # 82, at 10.  RBC contends that the error with respect to Williston was inadvertent.  Id.  Plaintiff further alleges that RBC falsely claimed in its EEOC position statement that Bryson was underperforming in 2005, when RBC "conceded" that Bryson's "June and possible [sic] July 2005 revenue goal numbers and/or operating profit percentages were better than those of male GMs."  Dkt. # 71, at 21.  RBC disputes this contention.  Dkt. # 82, at 10.  The RBC position statement does not specifically reference a year in which Bryson was allegedly underperforming.  Dkt. # 71-9.

Plaintiff alleges that, in response to a discovery interrogatory, defendant stated four reasons for Bryson's termination that were not stated in RBC's letter to the EEOC and were not provided to Bryson when she asked for a reason for her replacement.  Dkt. # 71, at 22.  Those reasons are as follows: "inconsistent and unsatisfactory financial performance of the stations under her management; a lack of understanding of financial matters and goals, lack of management skills; and consistent differences with and resistance to company positions and objectives."  Dkt. # 71-22, at 2.  Plaintiff contends that RBC's summary judgment motion, filed on December 26, 2007, "completely abandon[s] the stated reason in its EEOC Position Statement and the four reasons

provided during discovery."[5]  Dkt. # 71, at 22.  Plaintiff similarly contends that RBC's motion for summary judgment "abandons, and indeed contradicts, Renda's 2007 affidavit."  Dkt. # 71, at 24.

**D.     Additional Facts Relating to Plaintiff's Age Discrimination Claims**

Bryson was born in 1953.  Renda was born in 1935, Reich in 1951, Serena in 1952, and Kelly in 1955.  Kelly Aff., Dkt. # 57-3, at 33.  Bryson alleges that Phillips was approximately 40 years old when he replaced Bryson.  Phillips Depo., Dkt. # 71-16, at 2.  At her deposition, Bryson testified that Renda never made any age-related derogatory comments, and she never complained to anyone of age discrimination while she was employed.  Bryson Depo., Dkt. # 57-2, at 27-28, 34.  Bryson stated that Renda's treatment of her was more prominently motivated by gender than by age.  Id. at 25.

After Bryson was replaced as GM, she filed an unemployment benefits claim with the Oklahoma Employment Security Commission (OESC).  RBC business manager Sandra Cooper provided RBC's "Employer Statement Deductible Income/Severance," stating, in part, that a severance payment was made to Bryson because RBC "decided to part ways [with Bryson] and get a fresh face."  Dkt. # 71-17, at 5.

**E.     Additional Facts Relating to Gender Discrimination Claims**

Bryson does not dispute that she never heard Renda make any derogatory gender-related comments.  Bryson Depo., Dkt. # 57-2, at 25.  Bryson alleges, however, that there is other evidence of gender discrimination.  First, RBC currently employs no female GMs.  Serena Depo., Dkt. # 71-5, at 12.  Bryson also alleges that she received disparate treatment with respect to RBC's deferred

---

[5]     Defendant contends that this assertion of fact by plaintiff is improper and should be stricken from the record.  Dkt. # 82, at 11.  There is no legal basis to strike this statement from the record.

compensation plan.   In 2001, Bryson was advised that she would be ineligible for deferred compensation unless she signed a non-compete agreement.  Bryson Depo., Dkt. # 57-2, at 12.  Bill Scull and Bill Berry, both GMs from other states, signed less restrictive non-compete agreements and were given deferred compensation.  Id.  Bryson and Nielsen, a female GM from the same state as Scull, were asked to sign a longer, more demanding non-compete agreement.  Id. at 13.  Bryson refused to sign the non-compete in the form offered to her.  Id.  After Harrison left Oklahoma City, his replacement, Jim Williston, signed the same non-compete given to Bryson.  Id.  Plaintiff contends that deferred compensation was eliminated by 2004 when Williston replaced Harrison and was asked to sign the non-compete agreement.  Bryson Aff., Dkt. # 71-2, at 3.  RBC states that it maintained its deferred compensation program through 2006.  Kelly Aff., Dkt. # 82-3.

Bryson also alleges disparate treatment with respect to reporting to RBC corporate.  Prior to 2004, Bryson was the only GM who did not report directly to Renda.  Bryson Depo., Dkt. # 57-2, at 7; Renda Depo., Dkt. # 71-3, at 5.  Bryson reported to Adair and then to his replacement, Harrison.  Bryson Depo., Dkt. # 57-2, at 7.  Bryson believed that Renda had trouble dealing with a female GM, and that male GMs had more credibility with Renda.  Bryson Depo., Dkt. # 71-4, at 9.  Bryson contends that Renda excluded another female GM, Nielsen, from company events and screamed at her.  Nielsen Depo., Dkt. # 71-9, at 5,13.  Defendant disputes plaintiff's suggestion that Renda was difficult and demanding only to his female employees, because male employees also testified that Renda was controlling, would yell at them, and threatened to fire them.  Dkt. # 82, at 11-12.

Like Bryson, Nielsen was offered a GSM position and resigned instead of accepting.  Nielsen Depo., Dkt. # 71-9, at 4.  In addition, Reich, before joining RBC corporate, was a GM at RBC

Pittsburgh.  Reich Depo., Dkt. # 71-6, at 2.  She was also offered a GSM position instead of her GM

position, which she decided not to accept because "it might [have] be[en] difficult to step down at

the station" where she was previously the GM.  Id. at 3-4.  Plaintiff further contends that Albright

left RBC because she lacked credibility with Renda.  Dkt. # 71, at 25.  However, Albright testified

that "the reason [she] left that position [with RBC] was because [she] had an opportunity to go back

home . . . ."  Albright Depo., Dkt. # 71-10, at 14.  Plaintiff alleges that Albright believed that she had

no credibility with Renda on the basis of her gender.  Dkt. # 71, at 25.  At her deposition, Albright

testified that she believed that the reason she lacked credibility with Renda related to an incident that

occurred with Albright's former employer.  Albright Depo., Dkt. # 71-10, at 17.  Bryson testified

that Serena told her that he planned to replace Albright with a male GM because a "female will not

work in that market."  Bryson Depo., Dkt. # 57-2, at 15.

Finally, Bryson alleges that she received disparate treatment with respect to accrued vacation

pay.  Tim Van Maren, Bryson's operations manager, left the company and received vacation pay,

while Bryson did not.  Id. at 27.  Van Maren did not receive severance pay.  Van Maren Depo., Dkt.

# 57-2, at 17.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine

issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp.

v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986);

Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates

the entry of summary judgment, after adequate time for discovery and upon motion, against a party

who fails to make a showing sufficient to establish the existence of an element essential to that

12

party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

RBC argues that it had a legitimate, nondiscriminatory reason to replace plaintiff as GM and plaintiff can not carry her burden to show that RBC's stated reason was pretextual. Plaintiff claims that RBC's legitimate, nondiscriminatory reason for terminating her employment was pretextual, primarily because RBC offered inconsistent, shifting reasons for her termination, and because of other evidence of age and gender discrimination. Plaintiff has alleged that her termination violates the ADEA and Title VII.

13

**A.**

The ADEA provides, in pertinent part, that it is "unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1).  By statute, the protections of the ADEA extend only to individuals who are at least forty years of age.  29 U.S.C. § 631(a).  Title VII makes it "an unlawful employment practice for an employer to . . . discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).  ADEA and Title VII claims based on indirect evidence of discrimination are subject to the burden-shifting framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Beaird v. Seagate Technology, Inc., 145 F.3d 1159, 1165 (10th Cir. 1998); Branson v. Price River Coal Co., 853 F.2d 768, 770 (10th Cir. 1988) ("Cases brought under the ADEA are subject to the same indirect method of proof used in Title VII cases alleging discriminatory treatment.").  Under this framework, a plaintiff must first make a prima facie showing of discrimination.  Once plaintiff establishes a prima facie case, a presumption of discrimination arises and the employer has the burden to produce a "legitimate, nondiscriminatory reason" for its actions.  Miller v. Eby Realty Group, L.L.C., 396 F.3d 1105, 1111 (10th Cir. 2005).  If the employer does so, the employee must prove that the employer's explanation is merely pretext for unlawful discrimination on the basis of age or gender.  Id.

To establish a prima facie case of age discrimination under the ADEA, a plaintiff who is discharged must prove that:  she is within the protected age group, she was doing satisfactory work, she was discharged despite the adequacy of her work, her employer terminated her employment.  To establish a prima facie case of discriminatory discharge under Title VII, plaintiff must

demonstrate that she "(1) belongs to a protected class; (2) was qualified for her position; (3) was discharged; and (4) her position was not eliminated after her discharge." <u>Adamson v. Multi Community Diversified Services</u>, 514 F.3d 1136, 1150 (10th Cir. 2008). "A prima facie case of discrimination is one sufficient to raise a presumption of intentional discrimination." <u>Id.</u> (citing <u>St.Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993)).

RBC assumes for the purposes of its motion for summary judgment that plaintiff can establish a <u>prima</u> <u>facie</u> case of age and gender discrimination.[6] Therefore, the Court will assume without deciding that plaintiff can do so, and will consider RBC's legitimate, nondiscriminatory reason for replacing plaintiff as GM.

## B.

Defendant has the burden to "articulate some legitimate, nondiscriminatory reason" for plaintiff's termination. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802-03. "The defendant's burden is merely to articulate through some proof a facially nondiscriminatory reason for the termination; the defendant does not at this stage of the proceeding need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need prove that the reasoning was applied in a nondiscriminatory fashion." <u>EEOC v. Flasher Co., Inc.</u>, 986 F.2d 1312, 1316 (10th Cir. 1992). The Tenth Circuit has described the defendant's burden at this stage of the proceedings as "exceedingly light." <u>Zamora v. Elite Logistics, Inc.</u>, 478 F.3d 1160, 1165 (10th Cir. 2007).

---

[6]     Bryson was replaced as GM and offered another position, which she chose not to accept. Nonetheless, defendant does not contest that plaintiff can prove that she was discharged.

RBC has provided evidence that Renda, the owner of RBC, was not satisfied with Bryson's performance as GM of the Tulsa market; in Renda's opinion, Bryson was a "bad general manager." In its response to plaintiff's interrogatory, RBC provided more detail on why Bryson was a "bad general manager."   RBC stated that Bryson was replaced as GM because of "inconsistent and unsatisfactory financial performance of the stations under her management; a lack of understanding of financial matters and goals, lack of management skills; and consistent differences with and resistance to company positions and objectives."  Dkt. # 71-22, at 2.  Renda testified that he and Bryson disagreed about whether to have a single or split sales staff in Tulsa.  Dkt. # 71-3, at 9. Furthermore, Reich, Serena, and Kelly all stated in sworn affidavits that Bryson was "argumentative," "confrontational," and more difficult to work with than other GMs. Dkt. # 57-3, at 28-31.   RBC has satisfied its burden to articulate through some proof a legitimate, nondiscriminatory reason for its employment decision, and the Court will next consider whether RBC's stated reason is pretextual.

## C.

"A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." Stinnett v. Safeway, Inc., 337 F.3d 1213, 1218 (10th Cir. 2003) (quoting Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994)).  A plaintiff typically attempts to satisfy his burden by "revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'"  Mackenzie v. City & County of Denver, 414 F.3d 1266, 1278 (10th Cir. 2005) (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)).  Evidence

of pretext may include prior treatment of the plaintiff, "disturbing procedural irregularities," and the use of subjective criteria to make employment decisions.  Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir. 1999).  A plaintiff's "mere conjecture" that the employer's explanation is pretext is not a sufficient basis to deny a motion for summary judgment.  Branson v. Price River Coal Co., 853 F.2d 786, 772 (10th Cir. 1988).  Here, plaintiff argues that defendant's stated reason for the decision to replace her as GM of RBC Tulsa was pretext for illegal age and/or gender discrimination.

1.      **Age Discrimination Claim**

Plaintiff offers two arguments in support of her age discrimination claim: (1) RBC's inconsistent, shifting reasons for her termination provide evidence of pretext, and (2) comments made by an RBC manager suggest that age discrimination motivated the decision to replace her as GM of Tulsa.

Plaintiff argues that RBC's legitimate business reason is pretext because RBC has offered "inconsistent, shifting reasons" for her dismissal.  The fact that a defendant has offered different explanations for a plaintiff's termination does not alone create a genuine issue of material fact with respect to pretext.  See Jaramillo v. Colorado Judicial Dept., 427 F.3d 1303, 1311 (10th Cir. 2005).  However, a post-hoc justification for an employee's termination can constitute evidence of pretext.  Plotke v. White, 405 F.3d 1092, 1102 (10th Cir. 2005).  When Bryson was told that she was to be replaced, she asked whether she was a "bad general manager," and Renda responded in the affirmative.  Bryson Depo., Dkt. # 57-2, at 86.  Renda did not or would not elaborate as to why he believed Bryson was a bad manager.  RBC did not offer a substantive reason for Bryson's termination until Bryson filed an EEOC claim.  In response to Bryson's claim, RBC stated that it

was entitled to select the person it believed was the best for the job, and that Bryson was "consistently criticized for being consistently below the expected sales figures . . . ." EEOC Position Statement, Dkt. # 71-19, at 2.  However, there is no evidence in the record that Bryson was ever warned or disciplined for poor sales figures.  RBC's next comment on Bryson's replacement was in its response to a discovery interrogatory where RBC stated that Bryson was replaced because of "inconsistent and unsatisfactory financial performance of the stations under her management; a lack of understanding of financial matters and goals, lack of management skills; and consistent differences with and resistance to company positions and objectives."   Dkt. # 71-22, at 2. Thereafter, Renda, in a sworn affidavit, suggested that one reason for Bryson's replacement – her personality conflict with RBC corporate – made the other problems with her performance insurmountable.

Plaintiff argues that RBC's varied responses reflect a "significant and material" change in its reason for Bryson's replacement, and such a change is evidence of pretext.  Viewed in the light most favorable to plaintiff, there is sufficient evidence in the summary judgment record from which a reasonable juror could conclude that RBC's evolving explanations, if coupled with facts suggesting age discrimination, could indicate pretext.

Plaintiff argues that there is sufficient evidence of age discrimination in the record to show that RBC's business reason was pretext.  Bryson was 52 years old at the time she was replaced as GM of RBC Tulsa.  Of the RBC corporate officers, Renda, Reich, and Serena were older than Bryson, and Kelly was two years younger.  Kelly Aff., Dkt. # 57-3, at 33. Jon Phillips, who replaced Bryson, was approximately 40 years old at the time he was hired by RBC.  Bryson alleges that Renda and Serena made the decision to replace her as GM, and acknowledges that she never heard

either make a discriminatory remark related to age.  Other than the fact that Phillips is younger than Bryson, the only evidence Bryson offers in support of her age discrimination claim is Cooper's statement that RBC was looking for a "fresh face."  Bryson suggests that the "fresh face" comment is evidence that RBC was motivated by age discrimination when it decided to replace Bryson as GM.  Although Cooper responded to the OESC on behalf of RBC, there is nothing to indicate that Cooper had any involvement in the decision to replace Bryson as GM.[7]  In fact, Cooper was Bryson's subordinate at RBC Tulsa.  Dkt. # 57-3, at 33.  With respect to the remark itself, "fresh face" is not necessarily an age-related comment.  One looking for a change could be looking for a "fresh face;" "fresh" does not always imply "young."  Thus, Cooper's comment was ambiguous.  Moreover, while an age-related comment that directly refers to the plaintiff may support an inference of discriminatory intent, isolated or ambiguous remarks are "too abstract to support a finding of age discrimination."  See Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 531 (10th Cir. 1994) (internal citation omitted).  Cooper's comment is best characterized as a "stray remark" by an individual who was not involved in the employment decision, and as such is insufficient to support an inference of age discrimination.  At this stage of the proceedings, plaintiff bears the burden to produce some evidence that defendant was motivated by age discrimination.  Plaintiff's only evidence of age discrimination is one statement by an individual not authorized to make employment decisions, and the fact that her replacement is younger than she is.  Without evidence of a nexus

---

[7]     Bryson argues that, even if Cooper was not involved in the decision to terminate her employment, she was a company representative and, as such, her statements could bind the corporation.  Plaintiff's argument is without merit.  It does not matter whether Cooper could bind the corporation or was authorized to speak on its behalf.  The relevant inquiry is whether the decision makers demonstrated any discriminatory intent, making the stated reason mere pretext.

between Bryson's age and the decision to terminate her employment, there is no basis upon which a reasonable juror could find pretext. Despite the fact that RBC's evolving explanations may provide some evidence of pretext, there is insufficient evidence in the summary judgment record to support the inference that Bryson was terminated because of her age. Accordingly, RBC is entitled to summary judgment on Bryson's age discrimination claim.

**2.      Title VII Gender Discrimination Claim**

Bryson makes several arguments in support of her claim that RBC's justification for her termination is pretext. She argues that (1) inconsistent and shifting reason for her termination indicates pretext and (2) she and other female GMs received disparate treatment from Renda and management.[8] As discussed above, the business reason for Bryson's termination evolved in response to various inquiries, and if coupled with facts suggesting discrimination, may provide some evidence of pretext.

Bryson contends that she and other female GMs were treated differently than their male counterparts. One example of disparate treatment is that plaintiff reported to a supervisor, while the other GMs at RBC reported directly to Renda. Defendant argues that Bryson did not report to Renda because of a personality clash, but Bryson contends that the fact that Renda's only "personality

---

[8]     Plaintiff also contends that she was treated unfairly with respect to a deferred compensation program and accrued vacation pay. Bryson alleges that participation in the deferred compensation plan was contingent upon agreeing to a non-compete agreement, but the agreement she was asked to sign was far more restrictive than the one given to her male counterparts. However, the summary judgment record shows that several male GMs were required to sign the same non-compete agreement as Bryson. Bryson also argues that she did not receive accrued vacation pay when she left RBC, but a male colleague did. However, the male colleague did not receive a severance package. Neither of these arguments is persuasive, nor would either preclude summary judgment.

clash" was with a female GM is evidence of discrimination.  However, not all of the female GMs were required to report to an intermediary.  Diana Albright testified that she reported directly to Renda during her tenure with RBC.  There is also no evidence in the record that Nielsen, the other female GM at RBC, reported to a supervisor.  Therefore, Bryson's reporting arrangement does not independently demonstrate disparate treatment of women at RBC.

Bryson believes that she did not have credibility with Renda because of her gender.  In support of her argument, Bryson contends that when she wanted to use a single sales staff, her idea was rejected.  However, when male GMs advocated for the same position, Renda agreed.   Bryson also argues that she requested to promote a subordinate, Van Webb, and was not permitted to do so, but when Phillips became GM he was permitted to do so.  Bryson also relies on Renda's controlling management style as evidence of disparate treatment.  However, according to the testimony of other RBC employees, Renda exerted control over many of his employees, male and female.

Bryson argues that Renda's treatment of the other female GMs provides evidence that RBC's stated reason for her termination is pretext.  One female GM, Albright, testified that, like Bryson, she felt that she lacked credibility with Renda.  Albright attributed this belief to an incident involving her former boss, and not to her gender.  Nielsen, however, agreed with Bryson, and believed Renda lacked respect for women in the workplace.  Nielsen testified that she was excluded from golf outings with Renda and his male employees.  Although Nielsen later testified that she does not play golf, she nonetheless asked to be included and her request to participate in the golf outing was denied.  Nielsen also believed that Renda singled her out during training sessions to make sure that she understood the material, but did not do that to male employees.  According to Nielsen, Renda used obscenities and screamed at her, both in front of her employees and on the telephone.

Finally, Nielsen reported that once, at a funeral, Renda asked her why she did not question the funeral director's instructions and stated that "as a man" he made his own decisions.  Nielsen Depo., Dkt. # 71-9, at 9-10.

In response to plaintiff's contention that Renda discriminated against his female employees, defendant notes that two of the three RBC corporate officers working with Renda are women. However, Bryson argues that Reich and Kelly are in "subservient positions" and have no authority to exercise business judgment.  In addition, there are currently no female GMs at RBC.  Moreover, Bryson was not the only female GM to be offered a GSM position in lieu of termination; Nielsen and Reich were also removed from their GM positions and offered GSM positions.

Bryson next argues that Serena also evidenced discriminatory intent towards the female GMs. Specifically, Bryson refers to a comment Serena allegedly made about how he planned to replace Albright after she resigned in February 2005 with a male GM because a female GM would not work in the Punxsutawney, Pennsylvania market.   Plaintiff argues that Serena's remark is evidence of discriminatory  "animus and corporate policy."   Gender-based comments can be evidence of pretext, even if they do not directly relate to the plaintiff or the decision to terminate her employment.  Plotke, 405 F.3d at 1107 (citation omitted).  However, the plaintiff must show a nexus between the allegedly discriminatory statement and the employment decision.  Tomsic v. State Farm Mut. Auto. Ins. Co., 85 F.3d 1472, 1477-79 (10th Cir. 1996).  See also Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1136 (10th Cir. 2000) (stray remark by an individual not involved in the decision to terminate plaintiff's employment was insufficient to show pretext).  Bryson alleges that because Serena was involved in the decision to replace her, his comment was not a "stray remark," but provides evidence of gender discrimination at RBC and could raise the inference of pretext.

22

Finally, Bryson alleges that the circumstances surrounding Phillips' hiring suggests that the reason given for her replacement was pretextual.  Renda instructed Phillips to keep his interview with corporate and the subsequent offer secret when he interviewed with Bryson for the GSM position.  While declining to characterize the interview with Bryson as a "ruse," even Phillips thought that the secrecy surrounding his hiring was "strange."  Phillips Depo., Dkt. # 71-16, at 14. In addition, at the meeting in Oklahoma City, Renda complained that Bryson failed to hire Phillips as a GSM when he knew that he had already offered Phillips the GM position.  While these facts alone are insufficient to show a discriminatory intent, when viewed in light of the other evidence, the circumstances of Phillips' hiring could suggest pretext.

In sum, while it is true that employers are entitled to make decisions about staffing without incurring liability, an employer cannot do so with a discriminatory intent.  See Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1118-9 (10th Cir. 2007) (holding that the employer's decision need not be "wise, fair or correct; the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them.").  Bryson argues that her operating profit percentage was among the highest at RBC, and RBC concedes that it did not consider Bryson's numbers when Renda decided to replace her.  If true, the fact that RBC would remove a top-performing GM and replace her with a less experienced male candidate raises an inference of a discriminatory motive. While no one example of disparate treatment is sufficient to raise an inference of pretext, when the record is viewed in its entirety, and coupled with defendant's evolving explanation for Bryson's termination, there is sufficient evidence from which a reasonable juror could find pretext.

**IV.**

Plaintiff also claims that she was wrongfully discharged pursuant to state law, and asserts that the Oklahoma Anti-Discrimination Act (OADA), OKLA. STAT. tit. 25, § 1101 et seq., clearly articulates Oklahoma's public policy against age and gender discrimination.  Defendant argues that the OADA is unconstitutional and, accordingly, cannot be the basis of a state law wrongful discharge claim.  The Court need not reach the constitutionality of the OADA because plaintiff is not suing under the OADA; rather, the OADA reflects the public policy statement that forms the basis for plaintiff's Burk tort action.

In Burk v. K-Mart Corp., 770 P.2d 24 (Okla. 1989), the Oklahoma Supreme Court recognized a limited exception to the at-will employment doctrine and permitted a discharged employee to pursue a tort claim if she "is discharged for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with a clear and compelling public policy."  Id. at 29.  The elements of a Burk tort claim, as articulated in Burk and subsequent case law, are: "(1) an actual or constructive discharge (2) of an at-will employee (3) in significant part for a reason that violates an Oklahoma public policy goal (4) that is found in Oklahoma's constitutional, statutory, or decisional law or in a federal constitutional provision that prescribes a norm of conduct for Oklahoma and (5) no statutory remedy exists that is adequate to protect the Oklahoma policy goal."  Vasek v. Bd. of County Comm'rs of Noble County, 186 P.3d 928, 932 (Okla. 2008).  Because the OADA provides a remedy for individuals who were discharged on the basis of a physical disability only, a Burk tort is available to all individuals in the class of employment discrimination victims.  Collier v. Insignia Financial Group, 981 P.2d 321, 326 (Okla. 1999).  In response to a certified question from this Court, the Oklahoma Supreme Court confirmed

that the OADA created a unified class of individuals who are the victims of "handicap, race, gender, or age discrimination," and equal remedies are required for all such individuals.  Saint v. Data Exchange, Inc., 145 P.3d 1037 (Okla. 2006).

Until recently, Burk tort claims were unavailable when an employee, who would otherwise fall into the class of employment discrimination victims, had an "adequate" federal or state statutory remedy.  Clinton v. State ex rel. Logan County Election Bd., 29 P.3d 543 (Okla. 2001).  The court held that "the existence of a federal statutory remedy that is sufficient to protect Oklahoma public policy precludes the creation of an independent common law claim based on a public policy exception to the employment-at-will doctrine."  Id. at 546.  See Vasek, 186 P.3d at 933 (equating "adequacy" with "sufficiency").  However, the Oklahoma Supreme Court recently revisited the issue of adequacy in two cases, Kruchowski v. Weyerhaeuser Co., 202 P.3d 144 (Okla. 2008), and Shirazi v. Childtime Learning Center, Inc., No. 106089, 2009 WL 468576 (Okla. Feb. 24, 2009).  In Kruchowski, the court confirmed that a plaintiff may pursue a Burk tort claim "when the available remedies to the same class of employment discrimination victims are not uniform and evenhanded – regardless of whether the remedies originate under Federal or State law," and determined that the standard is no longer whether the federal or state remedy is "adequate," but whether it is "commensurate"[9] with the remedy provided for similar work-related discrimination.  Kruchowski, 202 P.3d at 153.  In Shirazi, the United States District Court for the Western District of Oklahoma certified two questions to the Oklahoma Supreme Court seeking to clarify whether the remedies available under the ADEA and Title VII are adequate, such that a Burk tort would be unavailable.

---

[9]      Webster's Dictionary defines "commensurate" as "equal in measure or extent."  WEBSTER'S COLLEGIATE DICTIONARY 231 (10th ed. 1994).

Shirazi, 2009 WL 468576, at *2 n.1.  In response, the Oklahoma Supreme Court reiterated that the proper inquiry, after Kruchowski, is no longer whether the remedies provided are adequate.  Id. at *2.  However, the court in Shirazi did not consider whether the remedies were commensurate, but whether they were the same.  Id.  According to Shirazi, a plaintiff must show that the "statutory remedy in existence is not the same as those provided for work-related discrimination within the same employment class."  Id. (emphasis added).  A Burk tort is thus sustainable only when the available remedies under federal or state law are either not "commensurate" with or not the "same" as the remedies provided for like or similar discrimination.  See Kruchowski, 202 P.3d at 153; Shirazi, 2009 WL 468576, at *2.  Thus, to survive summary judgment on her Burk tort claim based on gender discrimination, the remedies available to plaintiff under Title VII must be commensurate with or the same as those available to everyone within the class of employment discrimination.

The Court has no choice but to follow Kruchowski and  Shirazi and find that the remedies available under federal and state law are not uniform for all employment discrimination victims. Shirazi, 2009 WL 468576, at *2.  Thus, plaintiff's Burk tort  based on gender survives summary judgment.[10]  However, should plaintiff succeed on both her Title VII and Burk tort claims, she will not be permitted double recovery.  Id.

---

[10]     Because there is insufficient evidence in the record to support the inference that plaintiff's termination was the result of age discrimination, she can not establish that her termination violated Oklahoma public policy on that basis.  Therefore, the Court need not consider plaintiff's Burk tort claim for wrongful discharge based on age.  See Tatum v. Philip Morris Inc., No. 93-6018, 1993 WL 520983, at *3 (10th Cir. Dec. 14, 1993) (upholding the district court's grant of summary judgment on plaintiff's Burk tort claims where the district court previously determined that plaintiff's federal discrimination claims were without merit); Melton v. Farmers Ins. Group, No. 07-1014, 2008 WL 4899220, at *8 (W.D. Okla. Nov. 12, 2008) (plaintiff's Burk tort claim fails for the same reason plaintiff's federal claim fails). Defendant is entitled to summary judgment on plaintiff's Burk tort claim based on age discrimination.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment  and Brief in Support (Dkt. # 57) is **granted in part** and **denied in part**: it is **granted** as to plaintiff's federal and state age discrimination claims and **denied** as to plaintiff's federal and state gender discrimination claims.

**DATED** this 7th day of April, 2009.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT